CASE NO.  12-7012

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

JAMES MOORE                              PETITIONER-APPELLANT

vs.

UNITED STATES OF AMERICA            RESPONDENT-APPELLEE

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION
DISTRICT COURT NOS.
1:11-cv-1655-ELH
1:04-cr-00190-AMD

APPELLANT'S APPLICATION
FOR A CERTIFICATE OF APPEALABILITY

SUBMITTED BY:

K. Scott Williamson
Counsel for Appellant
Freedom Foundation, PLLC
110 Glancy Street, Suite 201
` Goodlettsville, TN 37072
615-865-0919 (office)
615-865-0921 (fax)
usfreedomfoundation@gmail.com

## QUESTIONS PRESENTED FOR REVIEW

I.     WHETHER THE DISTRICT COURT ERRED IN DENYING
       APPELLANT'S PRE-TRIAL INEFFECTIVE ASSISTANCE OF
       COUNSEL CLAIMS WITHOUT CONDUCTING AN EVIDENTIARY
       HEARING,  WHEN THOSE CLAIMS WERE BASED ON FACTUAL
       EVENTS OUTSIDE THE RECORD AND SUSTAINED BY
       CONTROLLING  PRECEDENT?

II.    WHETHER THE DISTRICT COURT ERRED IN DENYING
       APPELLANT'S CLAIMS THAT HE WAS DENIED HIS SIXTH
       AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL
       DURING TRIAL?

III.   WHETHER THE DISTRICT COURT ERRED IN DENYING
       APPELLANT'S CLAIMS THAT HE WAS DENIED HIS SIXTH
       AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL
       DURING SENTENCING?

# TABLE OF CONTENTS

**Reference:**                                                          **Page No:**

Questions Presented for Review……………………  …… ………...………...........2

Table of Contents……………………………… ……………………  …..............3

Table of Authorities……………………………………………………..........4-5

Statement Regarding Oral Argument........................................................................6

Jurisdictional Statement……………………………………………..… ..........6-8

Statement of the Case…………………………………………………...............8-18

Summary of the Argument……………………………………….............18-21

Standard of Review..........................................................................................21

Argument

      Question I… ……………………………………………..………..21-33

      Question II…… ………………  ……………………………..……34-38

      Question III………………………………………………………….38-48


Conclusion………… ………………………………………..………...........48

Certificate of Service…………………………………………………..........49

# TABLE OF AUTHORITIES

**Cases:**                                                                                    **Page No:**

*Barker v. Wingo,* 407 U.S. 514 (1972)…………  ……………  ……………………  25

*Gall v. United States,* 128 S.Ct. 586 (2007)……  …………………………………  47

*Glover v. United States,* 121 S.Ct. 696 (2001)…………………  …………  ………  31

*In Re Winship,* 397 U.S. 358 (1970)…………  …………………………………………  44

*Lafler v. Cooper,* 132 S.Ct. 1376 (2012)…………………………………  ………………19

*Mattox v. United States,* 146 U.S. 140 (1892)…………………  …………………….38

*Miller-El v. Cockrell,* 537 U.S. 322 (2003)…………  …………………  ….......... 19, 20

*Remmer v. United States,* 347 U.S. 227 (1954)…………………  ……………….....38

*Rita v. United States,* 127 S.Ct. 2456 (2007)……………………  ………….……...47

*Slack v. McDaniel,* 529 U.S. 473 (2000)………  …………………  …………...19, 20

*Strickland v. Washington,* 466 U.S. 668 (1984)……  ……………………  ……….....23

*Strunk v. United States,* 412 U.S. 434 (1973)……  ……………………  …………....29

*Thomas v. Taylor,* 170 F.3d 466 (4th Cir. 1999)……………  …………  …………….21

*United States v. Anderson,* 59 F.3d 1323 (D.C. Cir. 1995)………  ……………….40

*United States v. Barsanti,* 943 F.2d 428 (4th Cir. 1991)……  …………………….32

*United States v. Bowens,* 224 F.3d 302 (4th Cir. 2000)……  …………………..32, 33

*United States v. Breeden,* 2003 U.S. Dist. LEXIS 14807 (W.D. Va. 2003)…..22, 24

*United States v. Brooks,* 928 F.2d 1403 (4th Cir. 1991)………  …………………...35

*United States v. Fleming,* 739 F.2d 945 (4th Cir. 1984)……………….44

*United States v. Henry,* 538 F. 3d 300 (4th Cir. 2008)……  ........  ………........  25

*United States v. Le,* 311 F.Supp. 2d 527 (E.D. Va. 2004)…  …………  ………...24

*United States v. Luck,* 611 F.3d 183 (4th Cir. 2010)…………  ………………...34, 35

*United States v. Luskins,* 925 F.2d 372 (4th Cir. 1991)……  ……………………  39

*United States v. Magini,* 973 F.2d 261 (4ᵗʰ Cir. 1992)…… ………………….…19

*United States v. Meares,* 288 Fed. Appx, 892 (4ᵗʰ Cir. 2008)…… ………………47

*United States v. O'Quinn,* 166 Fed.Appx, 697 (4ᵗʰ Cir. 2006)……… …………...31

*United States v. Phipps,* 319 F.3d 177 (5ᵗʰ Cir. 2003)………….. ……………..40

*United States v. Reevy,* 364 F.3d 151 (4ᵗʰ Cir. 2004)… ………………..…45, 46, 47

*United States v. Roane,* 378 F.3d 382 (4ᵗʰ Cir. 2004)…… ……….. ………….…21

*United States v. Tejeda-Rameriz,* 380 F.ed. Appx. 252 (4ᵗʰ Cir. 2010)… ………...32

*United States v. Wallace,* 447 F.3d 184 (2d Cir. 2006)…… ……………………...40

*United States v. White,* 366 F.3d 291 (4ᵗʰ Cir. 2004)…...................19, 20, 23, 30, 31

*Zedner v. United States,* 547 U.S. 489 (2006)…………… ….... …...…... 23, 24, 25

**Constitutional Provisions:**

Fifth Amendment to the United States Constitution………… ……... .38, 39, 43, 45

Sixth Amendment to the United States Constitution………..............................*passim*

**Statutes & Rules:**

18 USC § 1111…………………… ……………………… ………………… ….... 44

18 USC § 924…………………… …………… …….……… 6, 39, 40, 41, 42, 46, 47

18 USC § 3161…… ……………………………………… ……........ 22, 24, 25, 27

21 USC § 846………………………………… ………………………….….…6

28 USC § 2253…… ………… …………… 19, 20, 25, 32, 33, 35, 37, 38, 41, 45, 48

28 USC § 2255… ………………………………… …….....................*passim*

Amendment 599 to the U.S.S.G…………………………………..…41

U.S.S.G. § 2A1.1………………………………………………….41, 43, 44

U.S.S.G. § 2D1.1……………………………………………....…41

U.S.S.G. § 2K2.4…………………………………………….46

U.S.S.G. § 5K2.21…………………………… …………….…47

**STATEMENT REGARDING ORAL ARGUMENTS**

Appellant James Moore respectfully submits that this Court would be aided by oral arguments, because the questions presented herein are complex and would provide guidance to the district courts in this Circuit thereby preserving judicial economy. As such, Mr. Moore asks the Court to set this matter for oral arguments as soon as practical.

**JURISDICTIONAL STATEMENT**

On April 6, 2006, the Grand Jury sitting in the United States District Court for the District of Maryland issued a Third Superseding Indictment charging Petitioner-Appellant James Moore, (hereinafter "Appellant" or "Mr. Moore"),  and co-defendant Babb as follows: (Count One) conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine and fifty grams or more of cocaine base in violation of 21 U.S.C. § 846; (Count Two) conspiracy to possess firearms in furtherance of a drug trafficking crime of 18 U.S.C. § 924 (o); (Count Three) use of a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924 (c); (Count Four) use of a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924 (c); (Count Five) use of a firearm to commit murder during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924 (i); (Count Six) use of a firearm to commit murder during and in relation to a drug trafficking crime in violation of 18 U.S.C.

§ 924 (i); (Count Seven) possession of firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924 (c). [R: 106]. [1]

On April 2, 2007, Mr. Babb and Mr. Moore appeared for a jury trial (Hon. Andre M. Davis, presiding), which concluded on April 19, 2007. At the close of the evidence, the government moved to dismiss counts Five and Six as to both defendants. As to Mr. Babb, the jury returned verdicts of guilty on counts One, Two, and Seven, but could not reach a verdict as to Count Three and Count Four. Those counts were later dismissed upon the government's motion. As to Mr. Moore, the jury returned verdicts of guilty as to counts One, Two, Three, Four, and Seven. [R: 135].

On July 24, 2007, both defendants appeared for sentencing. The district court sentenced Mr. Moore as follows: a period of life as to Count One; a period of 240 months as to Count Two, to be served concurrently with Count One; a period of 120 months as to Count Three, to be served consecutively to Count One; 120 months as to Count Four, to be served consecutively to Count Three; 300 months as to Count Seven, to be served consecutively to Count Three. The court also ordered ten years of supervised release and imposed a $300.00 special assessment and a $50,000.00 fine. [R: 141]. Mr. Moore timely filed a notice of appeal on August 1, 2007. [R: 145].

---

[1] "R" refers to the district court docket entry in this criminal case.

The Fourth Circuit Court of Appeals affirmed Mr. Moore's conviction and sentence on March 15, 2010. [R: 178]. Mr. Moore filed a motion to vacate pursuant to 28 USC § 2255 on June 13, 2011. [R: 182]. On April 10, 2012, the district court denied Mr. Moore's Section 2255 without a hearing. [R: 197, 198]. This instant appeal followed.

## STATEMENT OF THE CASE

James Moore, Devita Bush, Willie Robinson, and Barbara Haynes were acquaintances in New Rochelle, NY in the 1990's and early 2000's. Richard Jackson testified at trial that he had met Mr. Robinson in the mid 1980's when he visited New Rochelle. When Mr. Robinson moved to Danville, Virginia in 1995, Mr. Jackson provided him with crack for distribution. Mr. Jackson testified that, at that time, he was selling roughly five to six kilograms of cocaine each week to various buyers, and three ounces of crack each week to Mr. Robinson. He allegedly taught Mr. Robinson how to cook cocaine into crack, transport it, and sell it. According to Teresa Tyler, Mr. Robinson was known to possess numerous guns. Mr. Robinson made approximately $12,000 to $15,000 at his convenience store.

Mr. Jackson also testified that he was acquainted with Mr. Babb, because both of them used to deal drugs. Mr. Babb was incarcerated for a period of time but, upon his release, he began purchasing roughly nine ounces of crack from Mr. Jackson twice each week. Mr. Jackson testified that Mr. Babb operated his own

crack house in Greensboro, and that Mr. Jackson occasionally visited it to deliver drugs to Mr. Babb. By the time Mr. Jackson was arrested in early 2003, Mr. Babb was buying half a kilogram of crack from him each time for roughly $12,000.00. This allegedly happened roughly twice per week.

Devita Bush testified that she and Mr. Moore used to sell drugs together in New Rochelle until they moved to Andrews, South Carolina in September 2002. She testified that Mr. Robinson brought a small amount of crack to their home on July 4, 2003 for Mr. Moore to sell.

According to Ms. Bush, in August, 2003, Mr. Moore took a bus to El Paso, Texas and was gone about a week. He told her he was going to meet Ray Sanchez, whom Mr. Moore had said he met in jail and who had promised to sell him cocaine on "consignment." Ultimately, the deal was unsuccessful and Mr. Moore returned to South Carolina without drugs in August, 2003. In September, 2003, Bush left Mr. Moore and moved back to New Jersey.

Trial testimony suggested that another trip to El Paso took place in late October 2003, this time including Mr. Moore, Mr. Babb, Mr. Robinson, and Alexandria Withers. Adrian Williamson testified that Mr. Babb asked him to watch Mr. Babb's house in Greensboro because Mr. Babb was taking a trip to Mexico. Mr. Williamson testified that Mr. Babb left for Mexico in a black Dodge Intrepid

with a man named "R.D." (identified as Robinson) and a woman named Alexandria Withers, and was gone on that trip for roughly a week.

During the time Mr. Babb was gone, Mr. Babb's sometime-girlfriend, Porsha Harper, came over to assist with the house-sitting. Ms. Harper testified that, during this time, Mr. Babb called her from Mexico and explained that he was having an issue at the border and was unable to call her back. Ms. Withers' roommate, Contrita Johnson, also testified that Ms. Withers called her several times during this trip. Barbara Hayes testified that Mr. Robinson, the father of her children, had called her from Texas because his Intrepid had apparently broken down. (The Intrepid had originally been owned by Ms. Hayes, and although Robinson had taken over the payments, they had not officially changed the title.) Mr. Robinson asked Ms. Hayes if he could use her credit card number to rent another vehicle. Over a defense objection on the basis of hearsay, Ms. Hayes testified that Mr. Robinson told her that he was with "Fat James," whom he was trying to assist in getting back to Danville, Virginia. Ms. Hayes identified Mr. Robinson's number from Mr. Babb's phone records.

Ms. Bush further testified that Mr. Moore called her from Texas on both Ms. Withers' and Mr. Babb's phones, although she had never met Mr. Babb. Mr. Moore had allegedly told her that the plan for the trip was to connect Mr. Robinson to Ray Sanchez' supplier and make a $5,000.00 profit for each kilogram.

Apparently, upon Mr. Robinson's arrival with the cash for the deal, Mr. Sanchez did not have the drugs and instead connected him with another supplier who would ship the drugs directly to North Carolina. Mr. Moore also allegedly told Ms. Bush that Mr. Robinson had given him half the money for the drugs and was going to give him the balance once the drugs were delivered. Mr. Moore then supposedly told Ms. Bush that he was going back to North Carolina.

According to Mr. Williamson, when Mr. Babb, M r. Robinson, and Ms. Withers returned, Mr. Moore was with them. Ms. Harper testified that Mr. Moore had been in Mexico for several months, had established a "connection" here, and that Babb told her he was going to switch to that supplier. However, shortly after that discussion, Mr. Babb allegedly explained to Ms. Harper that he was no longer interested in not "doing the right thing."

On October 30, 2003 (also according to Ms. Bush), Mr. Moore told her that he was going to be staying in Greensboro, North Carolina with Mr. Babb where "They were waiting for the rest of the drugs to be delivered and for Round Head to give him the rest of his money." Mr. Babb told Ms. Bush that Mr. Moore was upset with Mr. Robinson because Mr. Robinson was not giving Mr. Moore the amount of money to which he thought he was entitled. Mr. Babb then told Bush that "he had explained to James that it wasn't Round Head's money for him to be giving to him, so he was not the big man. It wasn't his money to be dishing out like that." He

further told Bush that "the big man sent him [to El Paso] to watch over his money." Ms. Bush would somehow later learn that the "big man" was Richard Jackson, and that the money Mr. Robinson possessed actually belonged to Mr. Jackson. Ms. Bush further testified that Mr. Moore told her that, with the money, he intended to come get her and the kids and buy them a house.

On about November 5, 2003, Mr. Moore allegedly called Ms. Harper and asked her if she would like to go to New York. Ms. Harper was excited about the trip because she had never been to New York, and the plan was for her to drive Mr. Moore. At about 1:20 a.m. on November 6, Mr. Moore called her and said he was on his way over. Shortly after that call, Mr. Babb, a man Ms. Harper knew as "Tone Capone" (actually "Anthony McCormick"), and Mr. Moore arrived at Ms. Harper's apartment in two vehicles, one of which was the Intrepid. At that time, the men told Ms. Harper that Mr. Babb would not be going on the trip as she had expected. Ms. Harper got in the driver's seat of the Intrepid while Mr. Moore sat in the passenger seat. Mr. Babb and Mr. McCormick left in another car.

According to Ms. Harper, on the way to New York, Mr. Moore said that he was the "connect" in Mexico for New York and that there was $300,000.00 in the car with him. He then gave her $2,000.00 in cash, which she put in her boot. After passing Washington, D.C., Ms. Harper complained of her feet being sore and Mr. Moore took over driving.

On November 6, 2003 at approximately 10:00 a.m., the pair was stopped by a Maryland state trooper on I-95 in Cecil County, Maryland for driving seventy-four miles per hour in a sixty-five mile per hour zone. Ms. Harper was able to supply an identification card with her name and an insurance card with the name Barbara Hayes. Mr. Moore was unable to produce a driver's license. A pat-down revealed roughly $1,000.00 in Mr. Moore's pocket. Becoming suspicious, the investigating trooper (Corporal Cameron) returned to his cruiser and called for backup. Troopers First Class Conner and Spinner responded.

Trooper Conner approached the passenger window of the Intrepid and spoke with Ms. Harper, who was supposedly visibly shaking. While talking with Ms. Harper, the trooper noticed that a lot of clothing was piled in the back seat of the car and was curious why it was not stored in the trunk. He asked Ms. Harper if she had any clothes in the trunk and she responded: "Yeah. Do you want to look?" The trooper, of course, said "Yes." Ms. Harper then got out of the car and asked Mr. Moore where the keys were located. He told her they were still in the car. She retrieved them, made her way to the trunk, and opened it.

Inside, the troopers saw the outlines of two corpses situated in a spooning position, wrapped in a cover, and tied with rope. When asked about the bodies, Mr. Moore said that he did not know anything because it was not his car. The troopers

cuffed both the driver and Ms. Harper. Ms. Harper would later testify that she had had no idea what was in the trunk.

At the station, the officers searched Mr. Moore further and recovered roughly $2,267 in cash, a $300.00 money order from Greensboro, North Carolina made payable to Devita Bush in Riverside, New Jersey, and a piece of paper with phone numbers on it. Some of the cash had what the officer believed to be blood on it. Mr. Moore stated that there was a duffle bag in the Intrepid with over $100,000.00 in cash in it.

A search of the Intrepid revealed that the bodies were wrapped in a comforter and plastic bags, tied, and further covered with a shower curtain liner that was smattered with blood. The male victim was later identified as Willie Robinson (aka "R.D.," "Walter Moses," and "Roundhead"). The female victim was determined to be Alexandria Withers. Both victims had been shot to death. Multiple fingerprints were lifted from the plastic bags taken from bodies and found to match Mr. Moore. There were no prints recovered from the shower liner, but a trash bag recovered from the trunk had numerous prints that matched Mr. Moore. Money wrappers recovered from the car had the prints of both Mr. Robinson and Mr. Moore on them.  There were no prints lifted that matched those of Mr. Babb.

Also obtained from the search were two gas cans, a duffle bag with clothes in it, and shell casings. Some of the clothes recovered from the passenger compartment of the car had blood on them, including a Charlie Brown t-shirt recovered from a green backpack. The blood on the t-shirt was analyzed and found to match that of Mr. Robinson. Also obtained from the search were the following items: (1) an express mail receipt from James Moore in Andrews, South Carolina to Devita Bush on September 15, 2003, (2) an express mail receipt from James Howard in Danville, Virginia to Barbara Hayes in New Rochelle, New York on October 1, 2003, (3) a mobile phone and two pagers, (4) maps from Danville, Virginia to El Paso, Texas in a secret compartment, (5) a woman's boot with $2,000.00 inside, (6) a calendar, recovered from the green backpack, with a number written on it that would later be determined to be that of Mr. Babb, and (7) a pen with the inscription of Ray Sanchez's auto-repair business in El Paso, Texas in the Charlie Brown t-shirt.

At trial, Ms. Harper testified that she recognized the comforters and shower curtain found in the trunk as having once been in Mr. Babb's house. Mr. Williamson testified that, several days after hearing that R.D. had been killed, Mr. Williamson returned to Mr. Babb's house and noticed a new sofa and a love seat, new decorations and shower curtain in the bathroom, and a new carpet in the kids' room.

Ms. Bush testified to being a party to several phone calls between Mr. Babb and Mr. Moore, following Mr. Moore's arrest, in which Mr. Moore explained that Mr. Babb would provide her with money while Mr. Moore was in jail. In fact, she threatened to provide the Maryland State Police and federal law enforcement authorities with information about Mr. Babb if he did not give her money.

According to Ms. Bush, Mr. Babb wired her between $500.00 and $800.00 every three days for the initial period of time in which Mr. Moore was detained in Cecil County, telling her that the money was Mr. Moore's. According to Ms. Bush, Mr. Babb had associates of his in the Bronx drop $10,000.00 in cash off to her as well. She also testified that Mr. Babb sent her another $5,000.00 for Mr. Moore's lawyer, but that she spent half of it on herself.

Eventually, Mr. Babb complained that a federal investigation taking place in North Carolina –resulting from Mr. Moore's arrest– had curtailed his ability to sell drugs. Thus, Mr. Babb was unable to continue sending money to Bush. As a result, she took a bus from New York to North Carolina with the purpose of picking up drugs instead. Once there, Ms. Bush met Mr. Babb and his girlfriend, Tonya, at a bus stop in Greensboro. The three of them went to Tonya's house. Ms. Bush then testified that Mr. Babb retrieved 200 grams of crack cocaine from the ceiling, put it in a gym bag, and gave them to her. Ms. Bush's intention was to return to New York to sell it, but instead she decided to go to Maryland. Ultimately, with the help

of two acquaintances she had made in Cecil County, Ms. Bush sold about half of the crack. She smoked the other half.

Ms. Bush also testified to forwarding several calls from the Cecil County Detention Center to Mr. Babb, again going to North Carolina, and getting a small amount of cocaine and $200.00 from Mr. Babb. Ms. Bush testified that she never saw any guns in Mr. Babb's house. After returning to Maryland, Ms. Bush learned that federal authorities were investigating her whereabouts. She fled back to New York and was arrested on July 14, 2004 pursuant to an indictment issued by the grand jury sitting in the District of Maryland. The government provided no evidence of communication between Mr. Moore, Mr. Babb, and Ms. Bush after her arrest on July 14, 2004.

On August 16, 2004, nine months after Mr. Moore's arrest, officers from the Greensboro Police Department executed an arrest warrant for Mr. Babb at the home of Tonya Martin at 3615 Martin Avenue, Greensboro, North Carolina. Two days later, the officers executed a search warrant at that address and recovered two assault rifles located in the attic. Found about two feet away from the rifles was a bag containing an identification card bearing the name Walter Babb. Also recovered were a scale, a Glock pistol, and some ecstasy pills.

The case proceeded to trial on a Third Superseding Indictment charging Mr. Babb, Mr. Moore, and Ms. Harper with conspiracy to distribute and possess with

intent to distribute five kilograms or more of cocaine and fifty grams or more of cocaine base, conspiracy to possess firearms in furtherance of a drug trafficking crime, two counts of use of a firearm during and in relation to a drug trafficking crime (for the murders of Willie Robinson and Alexandria Withers), two counts of use of a firearm to commit murder during and in relation to a drug trafficking (for the murders of Willie Robinson and Alexandria Withers), and possession of firearms in furtherance of a drug trafficking crime (for the weapons recovered during the search of the house on Martin Avenue).

On April 18, 2006, the district court held a hearing on the defendants' motion to dismiss for improper venue. The motion was held *sub curia* and was later denied. On September 15, 2006, the district court held a hearing on Mr. Moore's motion to suppress evidence obtained from the search of the Dodge Intrepid. The court denied the motion to suppress and the Appellants do not raise that issue in this Court. Prior to trial, Ms. Harper pled guilty to one count of obstructing justice and testified for the government.

## SUMMARY OF THE ARGUMENT

This Circuit has repeatedly made clear that a district court must hold an evidentiary "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief", and "when the petitioner alleges facts which, if true, would entitle [him] to relief." *United States v. Magini*, 973

F.2d 261, 264 (4th Cir.1992).  See also *United States v. White*, 366 F.3d 291, 301-

302 (4th Cir. 2004) (remanding for an evidentiary hearing on factual allegations).

Critically, the issues and factual allegations made by Mr. Moore were not

patently incredible and were supported by affidavits, and which if accepted as true

by the district court, would have entitled Mr. Moore to habeas relief.

Moreover, recently in *Lafler v. Cooper,* 132 S. Ct. 1376 (March 21, 2012),

the Supreme Court held that when a habeas petitioner alleges that he rejected a

plea offer due to ineffective assistance of counsel, the court must hold a hearing to

determine whether the petitioner would have accepted the plea.  Here, Mr. Moore

made that allegation.  However, the district court failed to conduct a hearing.

To be entitled to a COA, a habeas Appellant must make "a substantial

showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).   "When

the district court denies a habeas petition on procedural grounds without reaching

the prisoner's underlying constitutional claim, a COA should issue when the

prisoner shows, at least, that jurists of reason would find it debatable whether the

petition states a valid claim of the denial of a constitutional right and that jurists of

reason would find it debatable whether the district court was correct in its

procedural ruling."  *Slack v. McDaniel*, 529 U.S. 473, 483-84, 120 S. Ct. 1595, 146

L. Ed. 2d 542 (2000). See also *Miller-El v. Cockrell*, 537 U.S. 322, 327

(2003)(holding that a habeas petitioner "must show that jurists of reason could

debate the propriety of the district court's assessment of his constitutional claims or conclude that his claims "are adequate to deserve encouragement to proceed further."). This construction gives meaning to Congress' requirement that a prisoner demonstrate substantial underlying constitutional claims and is in conformity with the meaning of the "substantial showing" standard provided in adopted by Congress in AEDPA.

Because the district court's decision is in direct conflict with the controlling precedent of this Circuit and the Supreme Court, jurists of reason would find the district court's decisions debatable. As such, a certificate of appealability should issue. *Miller-El v. Cockrell,* 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a petitioner is entitled to a COA if he can "demonstrate that reasonable jurists would find the District Court's assessment of the constitutional claims debatable or wrong." See also *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000).

In sum, the district court clearly erred in dismissing Appellant's Section 2255 based on its legal conclusions, and abused its discretion in refusing to conduct an evidentiary hearing on the factual allegations outside the record. *United States v. White,* 366 F.3d 291 (4th Cir. 2004). Accordingly, the decision of the district court must be reversed. Alternatively, the decision of the district court

should be reversed and this matter remanded with instructions to hold an evidentiary hearing.

## STANDARD OF REVIEW

When reviewing the denial of habeas relief, the district court's findings of fact are reviewed for clear error and issues of law are reviewed de novo. *United States v. Roane*, 378 F.3d 382, 395 (4th Cir. 2004). The Court reviews for abuse of discretion a district court's refusal to conduct an evidentiary hearing or to authorize discovery proceedings. *Thomas v. Taylor,* 170 F.3d 466, 474-75 (4th Cir. 1999).

## ARGUMENT

**I.   THE DISTRICT COURT ERRED IN DENYING APPELLANT'S PRE-TRIAL INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS WITHOUT CONDUCTING AN EVIDENTIARY HEARING, WHEN THOSE CLAIMS WERE    BASED ON FACTUAL EVENTS OUTSIDE   THE RECORD AND SUSTAINED BY CONTROLLING PRECEDENT.**

Within Ground One of his Section 2255, Mr. Moore raised several claims of ineffective assistance of counsel pre-trial. As demonstrated below, those claims were based on factual events outside the record which were material to the determination of those claims, and were sustained by controlling precedent. As such, the district court clearly erred and abused its discretion in granting summary judgment against Appellant without conducting an evidentiary hearing.

**(1)    Counsel's failure to challenge the violation of Appellant's statutory right to a speedy trial:**

Within his Section 2255, Mr. Moore asserted that his attorney was constitutionally ineffective for failing to move to dismiss based on the violation of Mr. Moore's statutory rights to a speedy trial.  In denying this claim, the district court merely stated that because the case was potentially a death penalty case, the continuance was proper and Appellant's counsel was not ineffective for failing to raise a speedy trial violation claim, i.e., a motion to dismiss.  [R: 197, at 11-12]. Respectfully, the district court's factual and legal conclusions are clearly erroneous, and the court abused its discretion in refusing to grant a hearing on the factual events outside the record.

Contrary to the district court's conclusions, it cannot be disputed that the Speedy Trial Act was violated in this case.  Here, the government not only misrepresented the facts of this case, but also the controlling precedent pertaining to those claims.  For example, contrary to the government's assertions, a continuance request cannot be granted for the purposes of seeking a superseding indictment or for seeking the death penalty.  *See United States v. Breeden,* 2003 WL 22019060 (W.D. Va. 2003).  While the government alleged that the continuance actually helped Mr. Moore, such a contention is not only speculative, it amounts to an attempt to testify about facts which it was not a party to, and facts which are not verified.  Critically, the law of this Circuit is clear and unambiguous,

"the government must present evidence in support of its position," and that its **"unverified responses … were plainly inadequate**." *United States v. White,* 366 F.3d 291, 304 (4th Cir. 2004) (emphasis added).

The government went on to argue, and the district court agreed, that Mr. Moore and his co-defendants filed numerous motions which tolled the clock. There are two serious flaws in that position. First, the 70-day period was already expired prior to the filing of these motions. And secondly, while Mr. Moore has already admitted that some of these motions tolled the clock, the statute and controlling precedent is clear that such motions do not toll the clock indefinitely as suggested by, and indeed, needed by the district court to sustain its unprecedented position.

Finally, the district court also completely misapplied the law as to what constitutes "prejudice" under *Strickland.* Contrary to the district court's conclusions, to demonstrate prejudice resulting from counsel's failure to raise this violation, Mr. Moore does not have to prove that the charges would have been dismissed with prejudiced – although that is certainly a very real possibility in light of the government's admissions *on the record.* Rather, the Supreme Court in *Zedner V. United States,* 547 U.S. 489, 501 (2006), made clear that a violation of the Speedy Trial Act *is not subject to harmless error review,* but rather the district court "*must* dismiss the charges, though it may choose whether to dismiss with or

without prejudice." *Id. at* 547 U.S. 499 (emphasis added).   Because the question of dismissal with or without prejudice has never been presented to any court, any determination at this point amounts to no less than conjecture and speculation.

Critically here, the government never had any intention of seeking the death penalty and, in fact, dropped the murder charges before submitting them to the jury.  Incredibly, at sentencing the government actually boasted about using the murder charges to delay this trial until it could develop a drug conspiracy case. Specifically, the government stated:

> ..***the government essentially had to investigate it until it became a drug-trafficking case.***  We had to turn this investigation into a drug-trafficking  investigation, ***which is why it took so many months or years to conclude it.***
> A state murder trial would have been a simpler thing to do, ***but we couldn't do that and have venue in Maryland without making it a drug-conspiracy case***,
> [Sent. Tr. at 17 (emphasis added)].

Notably, it is widely held that "a court may generally not continue a case solely to permit the government to file a timely Death Notice.  See, *United States v. Lee,* 311 F.Supp. 2d 527, 533 (E.D. Va. 2004); also, *United States v. Breeden,* 2003 WL 22019060 (W.D. Va. 2003)." However, that is exactly what the district court allowed to happen in this instant case, with no objection from Mr. Moore's attorneys.

.    Here, Mr.  Moore spent a total of ***1574 days*** incarcerated prior to the start of his trial. Of those days, less than 270 days were properly excludable.  Accordingly,

a total in excess of 1304 days were not excludable. As such, Mr. Moore's statutory right to a speedy trial was violated. Respectfully, any reasonably competent criminal defense attorney would have objected to the unjustified continuances, moved to dismiss the charges against Mr. Moore based on this violation, and appealed any adverse decision by the Court. Clearly, there is no strategic or tactical excuse for counsel's failure to raise this challenge. Had counsel done so in this case, there is more than a reasonable probability that Mr. Moore's charges would have been dismissed. See *United States v. Henry,* 538 F.3d 300 (4th Cir. 2008). Whether the charges would have been dismissed with or without prejudice is not a factor this Court can consider in determining this claim. *Zedner, supra* (holding that harmless error analysis cannot be employed in the determination of a speedy trial violation).

Accordingly, the decision of the district court must be reversed and Mr. Moore's convictions and sentences set aside and vacated. Alternatively, a COA should be granted and this question set for further briefing and/or argument.

**(2)    Counsel's failure to challenge the violation of Petitioner's Sixth Amendment right to a speedy trial:**

While the district court agrees that the extraordinary delay in this case was presumptively prejudicial, it denied this claim after concluding that Mr. Moore could not satisfy the other *Barker* factors.

Although the district court refused to assign responsibility to the government for the reasons for the delay, by ruling that the time Mr. Moore spent in state custody prior to the federal indictment is irrelevant, the government's own words during this sentencing hearing defeats that conclusion. As the record shows:

> ..***the government essentially had to investigate it until it became a drug-trafficking case.*** We had to turn this investigation into a drug-trafficking investigation, ***which is why it took so many months or years to conclude it.***
> A state murder trial would have been a simpler thing to do, ***but we couldn't do that and have venue in Maryland without making it a drug-conspiracy case***,
> [Sent. Tr. at 17 (emphasis added)].

Even so, the government failed to justify the 30-month delay it asserted is dispositive. While the government insisted that its motion to exclude stated that it had "commenced" discovery in this case, that does not negate the fact that at that time *it had still not provided discovery in a timely manner* as required not only by the local rules, but the Act itself in order to satisfy the 70-day requirement.

Notably, the *government attempted to blame the district court itself* for the extraordinary delay. Specifically, the government insisted that "other than the request by the government that the period for capital review [which is not a valid basis for the delay] be excluded from the STA, the trial and motions schedule w*ere set entirely by Judge Davis*, in consultation with and the acquiescence of the defense." [R: 192; Gov.'s Res. at 42 (emphasis added)]. Respectfully, there are several problems with that position. First, capital review is not a basis for the

delay.  Second, it is the government's responsibility – and not the district court's – to bring a defendant to trial within a timely manner.  Finally, the government cannot "testify" as to the discussions between Mr. Moore and his attorney, or whether Mr. Moore agreed to the continuances.  In fact, it is worthy to note that the government itself admitted that "Moore filed a pro se brief in which he claimed a speedy trial violation," which is directly at odds with the government's representations as to "acquiescence."  [R: 192; Gov.'s Res. at 42, and fn. 2].

As such, the second factor, reasons for the delay, also weighed in Mr. Moore's favor. Here, the delays were caused by the government, not by the Appellant.  Specifically, the government requested and received numerous continuances - all without Mr. Moore's knowledge and consent – based on a myriad of reasons including allegations that this was complex case, and that it may be seeking the death penalty. However, none of these are valid reasons for the lengthy continuance granted in this case. Rather, as seen by the government's own words during sentencing, "We had to turn this investigation into a drug-trafficking investigation, *which is why it took so many months or years to conclude it.*" [Sent. Tr. at 17 (emphasis added)]. As previously stated, established law precludes delays so that the government can seek either a superseding indictment or the death penalty.

While the record of this case does not specifically reflect Mr. Moore's assertion of his right to a speedy trial, it does include Mr. Moore's "pro se brief in which he claimed a speedy trial violation," [R: 192; Gov.'s Res. at page 42, fn. 2], which is sufficient to sustain his assertion of the right.  Nonetheless, and as stated asserted under the penalty of perjury, at no time did Mr. Moore's attorneys ever inform him of either his statutory or constitutional right to a speedy trial. [R: 182; 2255 Exhibit 1 -Affidavit of Petitioner].[2]

 Finally, although a specific showing of prejudice is not required, and indeed is sometimes impossible to point to, it cannot be seriously disputed that Mr. Moore clearly suffered from lengthy and oppressive pretrial incarceration, which only added to his anxiety and concern.  Finally, there is no question that Mr. Moore's defense was seriously impaired in this case by the subsequent testimonies of his co-defendants against him, *which were obtained only after the government overbore the wills of these co-defendants by the lengthy incarcerations*.  Moreover, and as admitted by the government itself, but for this extremely delay, it did not "*have venue in Maryland without making it a drug-conspiracy case*."  *Id.*

Respectfully, in light of the record of this case, any reasonably competent criminal defense attorney would have moved to dismiss the charges in this case

---

[2] Because Appellant's failure to specifically assert the right was due solely to ineffective assistance of counsel, the government must assume that burden.  *See Kimmelman v. Morrison,* 477 U.S. 365 (1986)(holding that '[t]he Sixth Amendment mandates that the [government] bear the risk of constitutionally deficient assistance of counsel.").

based on the violation of Mr. Moore's constitutional right to a speedy trial. By not doing so, counsel allowed Appellant's Sixth Amendment right to a speedy trial to go unchallenged. While the district court also denied this claim based on the government's assertion that "there was just too much evidence that he was a murderer," [Gov.'s Res. at page 44], had counsel moved to dismiss based on this violation, the district court would have had no choice but to dismiss these charges with prejudice. See *Strunk v. United States,* 412 U.S. 434 (1973) (holding that dismissal with prejudice is the only remedy for a violation of a defendant's 6th Amendment right to a speedy trial). Alternatively, that decision would have been overturned on appeal. Simply put, and regardless of whether there was "just too much evidence," a conviction obtained in violation of a defendant's Sixth Amendment right to effective assistance of counsel is unconstitutional and cannot be sustained.

As such, the decision of the district court should be reversed and Mr. Moore's convictions set aside and vacated. Alternatively, an evidentiary hearing is mandated in this matter.

**(3)** **Petitioner's decision to proceed to trial was unknowing and involuntary due to ineffective assistance of counsel:**

Although the government attempted once again to "testify," its pleadings were not verified, thus, its "testimony" was not worth the paper it is written on. *White, supra.* Likewise, the government cannot somehow now "testify" as to

conversations and discussions between Mr. Moore and his attorney since the government was not a party to those discussions. If the AUSA wants to "testify," then he must do so under oath where he is subject to cross-examination.

Here, defense counsel informed Mr. Moore prior to trial that the government had offered a plea agreement. [R: 182; 2255 Exhibit 1]. Counsel informed Appellant that the plea agreement required him to admit to murder and to accept a mandatory life sentence, and that the government would not agree to any other plea. *Id.* Based on those representations, counsel advised Appellant to reject the plea agreement, which Mr. Moore did did. *Id.*

As stated by the government in its response, and accepted by the district court although not verified, Mr. Moore has learned that the government would have been agreeable to a plea of guilty to the drug conspiracy charge, and that his sentence would not have been a mandatory life sentence. Further, Mr. Moore learned that he could have received a further reduction if he provided substantial assistance. Mr. Moore stated under the penalty of perjury that had he been made aware of these facts, he would not have proceeded to trial but would have insisted on pleading guilty. [R: 182; 2255 Exhibit 1].[3]

---

[3] As seen by the Fourth Circuit's Opinion in this direct appeal, Mr. Moore already had admitted that "he was running drugs…and that he had hundreds of thousands of dollars in the car." [R: 182; 2244 Exhibit 2, at 7]. As such, this is further objective evidence that he would have pled guilty to the drug trafficking conspiracy.

Counsel's performance was deficient when he set Mr. Moore's case for trial without having properly explained the advantages, disadvantages, risks and rewards of going to trial. As seen by the government's own response to this claim. counsel's advice to Appellant was at best a total misstatement of applicable law, and at worst a complete abandonment of counsel's duty to properly advise Mr. Moore as regards the acceptance of the government's plea offer.  Appellant received a sentence of life plus 35 years when he could have accepted a plea agreement resulting in a 10-year sentence. The misinformation provided Mr. Moore by counsel resulted in Appellant rejecting a plea agreement that resulted in him receiving a death sentence in prison.  See, *Glover v. United States*, 531 U.S. 198, 204 (U.S. 2001) (any amount of actual jail time has Sixth Amendment significance).

In such cases, an evidentiary hearing is mandated by statute and controlling precedent. *United States v. O'Quinn*, 166 Fed. Appx. 697 (4th Cir. 2006) (remanding for an evidentiary hearing on whether counsel failed to inform petitioner of plea agreement).  See also *United States v. White*, 366 F.3d 291, 302 (4th Cir. 2004) ("Where the ultimate resolution rests on a credibility determination, an evidentiary hearing is especially warranted.") (citing *Raines*, 423 F.2d at 530); *United States v. Tejeda-Ramirez*, 380 Fed. Appx. 252 (4th Cir. 2010).

Moreover, the Supreme Court's recent decision in *Lafler* is directly on point and controlling, i.e., based on these facts the district court was required to conduct an evidentiary hearing.

Accordingly, the district court's decision must be reversed and Mr. Moore's convictions and sentence should be set aside and vacated, and/or an evidentiary hearing set in this matter. Alternatively, Mr. Moore is entitled to a COA on this question.

**(4)     The failure to properly argue venue:**

Contrary to the government's misrepresentations and the district court's erroneous legal conclusion, when multiple counts are alleged in an indictment, venue must be proper on each count. *See United States v. Bowens*, 224 F.3d 302, 308 (4th Cir. 2000), *cert. denied*, 121 S. Ct. 1408 (2001). Venue on a count is proper only in a district in which an essential conduct element of the offense took place. *See id.* at 309. The burden is on the Government to prove venue by a preponderance of the evidence. *See United States v. Barsanti*, 943 F.2d 428, 434 (4th Cir. 1991).

Here, Counts Three and Four charged Mr. Moore with carrying and discharging a firearm during the murders of Mr. Robinson and Ms. Withers. The obvious problem with these counts is that even if true, they occurred in North Carolina and not in Maryland. While the transportation of bodies may have been

an overt act of an alleged conspiracy to commit murder, the alleged "carrying" and "discharge" occurred long before Mr. Moore entered Maryland. As such, venue was not proper in Maryland. *Bowens, supra.*

Accordingly, counsel's failure to challenge venue for these two counts was not reasonable competent, nor can that failure be excused as either a tactical or strategic decision. Had Mr. Moore's attorneys raised this challenge at the district level and/or on appeal, there is more than a reasonable probability that the result would have been different. In fact, these two counts would have been dismissed.

As such, Mr. Moore's convictions and sentences for Counts Three and Four must be vacated and set aside. Alternatively, a COA should issue and this matter set for further briefing and/or argument.

### (5)    The failure to challenge the use of Appellant's statements:

Yet again, the government attempted to "testify" as to privileged conversations that occurred between Mr. Moore and his attorney. Understandably, the government went on to assert that even without Mr. Moore's confession, there was sufficient evidence to convict. While that may be true, it does not negate the fact that counsel's performance was deficient, thus, this claim must be considered in combination with Mr. Moore's other claims in considering whether he was denied his fundamental right to a fair trial.

## II.   APPELLANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL DURING TRIAL.

### (1)   <u>The failure to request a cautionary instruction</u>:

While the district court is correct that it gave a cautionary instruction, that instruction was a misstatement of law.  More specifically, the district court erroneously instructed the jury that "You in turn may accept the testimony of these witnesses and convict the defendant on the basis of the witness's testimony alone if it convinces you of the defendant's guilt beyond a reasonable doubt." [R: 197; at 25]. Critically, and contrary to the district court's ruling, the instructions given in this instant case practically mirror the instructions given in *United States v. Luck*, 611 F.3d 183 (4th Cir. 2010).  As the *Luck* Court ruled:

> It is true that the district court's general instructions on witness credibility contained all of the elements of the informant instruction. However, the informant instruction is *sui generis*;......

> Merely giving general instructions as to witness credibility is not sufficient to give confidence that the outcome was not tainted by prejudice.
> *Id.* at 611 F.3d 189-190.

This Circuit has made clear that an informant instruction must be given anytime the witness "provides evidence against a defendant for pay, or for immunity from punishment, or for personal advantage or vindication."  *United States v. Luck*, 611 F.3d 183, 186 (4th Cir. 2010) [quoting *United States v. Brooks*,

928 F.2d 1403, 1409 (4th Cir. 1991)]. During trial, the government presented several witnesses who were allegedly co-conspirators. Each of these witnesses testified in exchange for sentence reductions and/or the promise from the government to not be prosecuted.

In light of the well established precedent, it cannot be disputed that counsel's failure to request this instruction and/or the failure to raise the error on appeal was constitutionally deficient performance. In light of *Luck,* it is also indisputable that had the instruction been requested, it would have been given and called into question the very heart of the government's case, i.e., its paid informants.[4]  Had the claim been raised on direct appeal, it is without doubt that the Fourth Circuit would have remanded for a new trial. *Luck, supra.*

Accordingly, the decision of the district court should be reversed and Mr. Moore's convictions and sentences vacated and a new trial granted, or an evidentiary hearing set in this matter. Alternatively, Mr. Moore is entitled to a COA on this issue.

**(3)    The failure to properly argue insufficiency of the evidence:**

Here, the district court ruled that there was no error because the court instructed the jury that the defendants could be convicted so long as the jury found that at least one act committed in furtherance of the drug conspiracy occurred in

---

[4] Mr. Moore did not allege that the witnesses were paid in money, but received immunity and/or lesser sentences in exchange for their testimonies.

Maryland.  [R: 197; at 27-28].  Critically, however, the instructions cited and referenced in support of its decision do not involve Counts Three, Four, and Seven.

Moreover, as demonstrated previously, venue was improper in Maryland for at least Counts Three, Four, and Seven.  While venue is a legal question that must be decided by the trial judge, that does not prevent a defense attorney from arguing to the jury that the government had failed to prove one of the essential elements charged, i.e., that the offense(s) occurred in the district where the jury is sitting.

Respectfully, there is no tactical or strategic reason for counsel's failure to make this argument at the district level to the jury, and/or to the Court of Appeals if the jury still found Mr. Moore guilty of these counts.  Had counsel done so, there is at least a reasonable probability that the jury would have acquitted, or the Fourth Circuit would have reversed the convictions.  As such, the decision of the district court should be reversed and Mr. Moore's convictions and sentences for Counts Three, Four, and Seven should be set aside and vacated.[5]  Alternatively, a COA should issue and this matter set for further briefing and/or argument.

**(4)    <u>The failure to move for a mistrial:</u>**

Again, the district court erroneously applied the facts to this case. Specifically, while the Court of Appeals did reject this claim, it did so only after

---

[5] While one of these sentences was ran concurrent, the Supreme Court has consistently held that a defendant still suffers prejudice in such cases.

concluding that that "the conduct complained of was not mentioned by defense counsel." [R: 178; Opinion at 20]. This Court then concluded that "[t]here was no evidence that the judge had been notified by the jury that they were uncomfortable or whether he had noticed it on his own." [R: 178; Opinion at 21].

In other words, there was nothing in the record for the Fourth Circuit Court of Appeals to review other than the Judge's statements. Critically, had Mr. Moore's counsel requested a voir dire, the district court would have granted the request, or the Appeals Court would have reversed.

In other words, it is clear from the district court's comments that members of the jury had conveyed to the district court that they felt threatened and/or intimidated. Critically, the persons doing the intimidation were members of the victims' families. Based on these comments, any reasonably competent criminal defense attorney would have immediately moved to voir dire the jury and for a mistrial. Mr. Moore's counsels, however, failed to do so.

A defendant's right to a fair trial by an impartial jury free from potentially prejudicial influence from third parties includes the right to have a jury free from contact by third parties. *Mattox v. United States,* 146 U.S. 140 (1892). Moreover, there is a "presumption of prejudice to the defendant when there is any private communication, contact, or tampering, directly or indirectly with a juror during

trial about the matter pending before the jury." *Remmer v. United States,* 347 U.S. 227, 229 (1954).

Without question, the district court's comments make clear that some person or persons attending trial had directly or indirectly attempted to influence the jury. As such, Mr. Moore's counsel had a constitutionally obligation to voir dire the jury and to move for a mistrial. Here, however, Mr. Moore's attorneys sat idly by and made no comment. Respectfully, such performance is not only deficient, it was grossly deficient when viewed in light of the facts and circumstances of this case.

Accordingly, the decision of the district court should be reversed and Mr. Moore's convictions and sentences vacated and set aside, and a new trial granted, or this case remanded with instructions to conduct an evidentiary hearing. Alternatively, a COA should issue and this matter further briefed.

## III.   APPELLANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL DURING SENTENCING.

### (1)   The failure to properly argue double jeopardy:

Here, the government and the district court agreed that each of the convictions and sentences for Counts 3, 4, and 7 arose from the same predicate offense, i.e., Count One. However, the district court ruled that the consecutive sentences were nonetheless proper. Respectfully, the district court was comparing apples with oranges.

In *United States v. Luskin*, 926 F.2d 372, 378 (4th Cir. 1991), the Court of Appeals first addressed this question. While affirming Luskins' three § 924(c) sentences, this Court did so only because there were three separate attempts by Luskins to murder his wife. Critically, however, the Court made clear that when multiple § 924(c) convictions are based on the same conduct and/or underlying predicate, the district court must either vacate all but one of the § 924(c) convictions, or run all § 924(c) sentences concurrently. In sum, the Court ruled:

> To avoid any confusion, we want to emphasize what our holding does *not* mean. This ruling does not bar the government from obtaining an indictment that charges an individual with a crime of violence (or drug trafficking crime) and a lesser included offense, and also obtaining a section 924(c) count for each of those predicate counts. Instead, it merely prohibits the imposition of consecutive sentences for the two section 924(c) counts, in the event that the defendant is convicted on both predicate offenses and gun counts. Under our judicial system, prosecutors are permitted to carve up criminal conduct into multiple counts, even if some of the counts are lesser included offenses or constitutionally identical offenses. There are two reasons for allowing the trial of an individual on repetitive counts. First, if it is uncertain that the jury will convict a defendant on a major count, the prosecutor is allowed to obtain, in the alternative, a sure-fire conviction on a lesser included offense. Second, this allowance helps to prevent minor problems of proof on one count from allowing a genuinely guilty person to escape liability for his criminal conduct. The Double Jeopardy Clause does not force the prosecutor to gamble on obtaining the major conviction. Instead, the defendant can be indicted on both counts, and, if convicted on both, the Double Jeopardy Clause operates to require that the sentences on the two counts run concurrently. The better practice in that instance would be for the trial judge to strike the conviction on the lesser included offense and the related section

>924(c) conviction. *See Ball v. United States*, 470 U.S. 856, 865-
>66, 84 L. Ed. 2d 740, 105 S. Ct. 1668 (1985).
>*Id.* at 926 F.2d 378.

See also *United States v. Phipps*, 319 F.3d 177 (5th Cir. 2003) (holding that

multiple § 924(c)(1) convictions could not be based on two violent predicate

crimes arising from a single use of a firearm); *United States v. Wallace*, 447 F.3d

184 (2d Cir. 2006) ("where a defendant is charged with the continuous,

constructive possession of a firearm in furtherance of a sale of a part of a quantity

of narcotics possessed, coupled with the continued possession of the remainder

immediately following the sale, Congressional intent is not sufficiently clear to

compel such a result, which even the dissent agrees is 'draconian'".); *United States*

*v. Anderson,* 59 F.3d 1323 (D.C. Cir. 1995) (collecting cases and holding that

"[s]even of our sister circuits have determined that only one § 924(c)(1) violation

can be appended to any single predicate crime.").

   Without question here, each of the § 924(c) counts in this instant case where

based on a "single predicate crime," i.e., the drug trafficking offense charged in

Count 1.  While Count 7 may have involved guns found after Mr. Moore's arrest,

Amendment 599 to the U.S.S.G. makes clear that multiple guns cannot form the

basis of additional enhancements or sentences. As such, counsel's failure to argue

multiplicity, and that the imposition of consecutive sentences for the § 924(c)

convictions violated Mr. Moore's right to be free from double jeopardy, was

grossly deficient performance in light of the well established precedent on this question. Had counsel done so, either at the district level and/or on appeal, there is more than a reasonable probability that the result would have been different. In fact, it is a certainty.

Accordingly, the decision of the district court should be reversed and Mr. Moore's sentence must be corrected to reflect one § 924(c) conviction, or the remaining sentences must be ran concurrently. Alternatively, a COA should issue and this matter set for further briefing and/or argument.

**(2)** **The failure to properly challenge the life sentence:**

Mr. Moore's life sentence was based entirely on the cross reference from the guidelines for Count 1 (i.e., § 2D1.1) to the guidelines for premeditated murder found in § 2A1.1. During sentencing, Mr. Moore's attorney attempted to argue that Mr. Moore was only an accessory after the fact and that the cross-reference should not apply. [R: 152; Sent. Tr. at page 12]. In response, the government argued that "there isn't any question about that they [the jury] rejected any idea of him being an accessory after the fact…..[because]…[i]f they found him being an accessory after the fact, they would have found him not guilty of Counts 3 and 4." [R: 152; Sent. Tr. at 15]. Mr. Moore's counsel did not respond to the government's position.

Although the district court agreed that absent a premeditation finding, the district court might not have imposed a life sentence, it ultimately denied the claim by concluding that no error occurred because the sentencing judge apparently believed that Mr. Moore has prior knowledge and intent of the murders, and because the life sentence was authorized by statute. [R: 197; 35-37].

Respectfully, there are several problems with the district court's conclusions, the government's representations, and with counsel's failure to correct those misrepresentations. First, the district court's position amounts to no more than speculation as to the jury's findings. The jury was not asked to consider whether Mr. Moore murdered anyone, either with or without premeditation. Second, Counts 3 and 4 do not require a finding that Mr. Moore murdered anyone. Instead, both counts charged that Mr. Moore used a firearm during and in relation to a drug trafficking crime.

Finally, and perhaps the most critical, Counts 3 and 4 charged Mr. Moore with "aiding and abetting." Moreover, the district court specifically instructed on aiding and abetting. And critically, as clearly seen during the colloquy that occurred in regards to the jury's note during deliberations, they were *only* considering "aiding and abetting." Specifically, the jury's note read:

> "With respect to counts three and four, if a Defendant is not present at and has not participated in planning the crime, parens, of a discharging a firearm against either of the victims, closed

paren, and had no foreknowledge that the crime would take place, can he be guilty of *aiding and abetiing*?"
[Tr. of 4-19-07 at page 2 (emphasis added)].

In other words, despite the district court's conclusions, the jury clearly found Mr. Moore only guilty of being an accessory after the fact, i.e., "aiding and abetting." As such, both the government's and the district court's positions were nothing more than pure speculation. Such a conclusion is violative of Mr. Moore's 5th Amendment Due Process rights, as well as his 6th Amendment right to have a jury make such a finding based on proof beyond a reasonable doubt.

Nonetheless, the district court further ruled that no finding of premeditation was required in order to impose the cross reference to §2A1.1. However, as clearly seen by Application Note 1 of § 2A1.1, "*This guideline applies in cases of premeditated killing.*" (emphasis in original in part and added in part). In plain terms, the guidelines clearly instruct a sentencing court that § 2A1.1 is only to be applied if there is a finding that the killing was "premeditated." *Id.* The 6th Amendment requires that such a finding must be made by the jury simply because "premeditation" is an essential element of 1st degree murder. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).

"Malice aforethought, as provided in 18 U.S.C.A. § 1111(a) (West Supp. 2007), is the distinguishing characteristic which, when present, makes a homicide murder rather than manslaughter." *United States v. Fleming*, 739 F.2d 945, 947

(4th Cir. 1984). "Malice aforethought may be established by evidence of conduct which is reckless and wanton and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that *defendant was aware* of a serious risk of death or serious bodily harm." *Id.* (internal quotation and citation omitted) (emphasis added).

The first degree murder cross reference applies in cases of premeditated killing. USSG § 2A1.1, cmt. (n.1). "'Premeditation' is a fully formed conscious purpose to kill that may be formed in a moment and need only exist for such time as will allow the accused to be conscious of the nature of the act *he is about to commit and the probable result of that act*." 40 Am. Jur. 2d *Homicide* § 44 (2007).

Here, the record was replete with indisputable proof that the jury was only considering "aiding and abetting." While an aider and abettor can be punished the same as a principle, the same constitutional safeguards apply, i.e., a finding by the jury based on proof beyond a reasonable doubt that Mr. Moore was involved in a "premeditated" murder. In this case, there clearly was no such finding. In fact, and as conceded by the government itself during trial the jury was considering only "aiding and abetting." [Tr. of 4-19-07 at page 4].

Accordingly, counsel's failure to raise this defense during sentencing and on appeal was not reasonably competent performance. Had counsel done so, there is a reasonable probability that Mr. Moore's sentence for Count One would have been

exactly what the government agreed it would have been based on the drug

quantities attributed to him – a sentence of 10 years.  [R: 152; Sent. Tr. at page 18].

As such, the decision of the district court should be reversed and Mr. Moore's

sentence corrected to reflect a sentence that comports with the 5th and 6th

Amendment, a sentence of 10 years.  Alternatively, a COA should issue and this

matter set for further briefing and/or argument.

**(3)    The failure to argue impermissible double counting:**

Double counting occurs when a provision of the Guidelines is applied to

increase punishment on the basis of a consideration that had been accounted for by

application of another Guideline provision or by application of a statute." *United*

*States v. Reevey,* 364 F.3d 151, 158 (4th Cir. 2004).   Here, Mr. Moore's sentence

for Count One was based on the same conduct and sentences imposed for Counts

Two, Three, Four, and Seven.  Specifically, Mr. Moore's sentence for Count One

was enhanced for use and/or possession of a firearm during the drug trafficking

crime charged in Count One.  As such, the enhancement constituted impermissible

double counting.

In *United States v. Reevey*, 364 F.3d 151 (4th Cir. 2004), the Court of

Appeals vacated the defendant's sentence due to impermissible double counting in

similar circumstances. Specifically, the Court ruled that the commentary to §

2K2.4 of the Guidelines prohibited the sentencing court from imposing an

enhancement for the "threat of death" when the defendant had also been sentenced for a § 924(c) violation based on that same conduct.  More specifically, the Court relied on Application Note 4 of § 2K2.4 which states:

> If a sentence under this guideline [governing § 924(c) offenses] is imposed in conjunction with a sentence for an underlying offense, *do not apply any specific offense characteristic for possession, brandishing, use, or discharge of . . . [a] firearm when determining the sentence for the underlying offense.*"

It is indisputable here that the district court imposed an enhancement under § 2A1.1 for Count One based on the same identical conduct charged in Counts 2, 3, 4, and 7, and for which Mr. Moore received consecutive sentences.  Respectfully, if a sentencing court is prohibited from enhancing a sentence based on a "threat of death," then a sentence enhanced based on death is just as precluded.

As discussed by the Court in *Reevey*:

> The relevant inquiry, under Application Note 4, is whether the threat-of-death enhancement was applied "for possession, brandishing, use, or discharge of an explosive or firearm." In this case, both of the threats made by Reevey were to *shoot* Jones (with a handgun that Reevey had already displayed), and they involved the firearm Reevey was convicted of possessing under § 924(c). *See United States v. Franks*, 230 F.3d 811, 813-14 (5th Cir. 2000) (concluding that sentencing court erred in enhancing sentence under § 2B3.1(b)(2)(F), where it was clear from evidence that threat of death was *related* to use of firearm); *United States v. Triplett*, 104 F.3d 1074, 1081-82 (8th Cir. 1997) (employing similar analysis).  In these circumstances, the threat-of-death enhancement was imposed on Reevey for possession and use of the firearm he was convicted of possessing under § 924(c), and application of the enhancement thus falls within the scope of Application Note 4's double-counting prohibition.

*Id.* at 364 F.3d 158-159.

As such, the imposition of a life sentence for Count One based on the same conduct Mr. Moore was being cumulatively punished for in Counts 2, 3, 4, and 7 constituted impermissible double counting. While the sentence imposed for Count One may have been within the statutory maximum for that offense, and while the Guidelines are merely advisory and the Court can take into account other conduct in determining an appropriate sentence, USSG § 5K2.21 requires that the conduct at issue may not have "enter[ed] into the determination of the applicable guideline range." *United States v. Meares*, 288 Fed. Appx. 892 (4th Cir. 2008) (vacating sentence and remanding after concluding that the district court erred in considering conduct in the determination of the defendant's advisory guideline range). Indeed, a district court may *not* even "presume that the Guidelines range is reasonable." *Gall v. United States*, 128 S. Ct. 586, 596-97 (2007); *see also Rita v. United States*, 127 S. Ct. 2456, 2465 (2007).

Simply put, the use of conduct Mr. Moore was already being punished for to determine his sentence for Count One is prohibited by the Guidelines and the controlling precedent of this Circuit. As such, counsel's failure to raise this argument at sentencing and on appeal was grossly deficient performance. Had counsel done so, there is at least a reasonable probability that the argument would have been sustained and Mr. Moore's sentence significantly reduced.

Accordingly, the decision of the district court should be reversed and Mr.

Moore's sentence for Count One corrected to reflect a sentence based on an

offense level of 32, i.e., a sentence of 10 years.  Alternatively, a COA should issue

and this matter set for further briefing and/or argument.

## CONCLUSION

Wherefore, due to the foregoing reasons and law, Appellant's convictions

and/or sentences must be vacated, set aside, or corrected, or an evidentiary hearing

is mandated in this matter by statute and controlling precedent.  Alternatively, a

COA should issue and this matter set for further briefing and/or argument.

Respectfully Submitted on this, the 14th day of September, 2012.


/s/ K. Scott Williamson

K. SCOTT WILLIAMSON
*Pro Hac Vice* Attorney
110 Glancy Street, Ste. 201
Goodlettsville, TN  37072
615-865-0919 (office)
615-865-0921 (fax)
usfreedomfoundation@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2012, a copy of the foregoing motion was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

Respectfully submitted this the 14th day of September, 2012.

/s/ K. Scott Williamson

K. SCOTT WILLIAMSON
*Pro Hac Vice* Attorney
110 Glancy Street, Ste. 201
Goodlettsville, TN  37072
615-865-0919 (office)
615-865-0921 (fax)
usfreedomfoundation@gmail.com